**In re R/P INTERNATIONAL TECHNOLOGIES, INC., Debtor.**

**Bankruptcy No. 1–85–00878.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

Dec. 4, 1985.

Richard Boydston, Strauss, Troy & Ruehlmann Co., L.P.A., Cincinnati, Ohio, for MK partnership.

Thomas R. Noland, Altick & Corwin, Dayton, Ohio, for debtor.

Jeffrey Marks, Cincinnati, Ohio, for Creditors Committee.

## DECISION ON DEBTOR'S MOTION TO ASSUME REAL ESTATE LEASE

BURTON PERLMAN, Bankruptcy Judge.

At Cincinnati, in said District, on the 4th day of December, 1985:

Debtor in this Chapter 11 case performs manufacturing operations for its customers on metal parts. Thus, it does shot-peening of metal parts and is also equipped to do certain machining operations. Debtor's operations are housed in a building in the community of Lincoln Heights, Ohio, which is near a large General Electric aircraft engine plant. Debtor occupies its building under a lease, and has fallen behind in its rental payments. Debtor wishes to continue to occupy its premises, and for that reason has filed the present motion to assume its lease. MK Partnership is the owner/lessor of the building occupied by debtor, and will hereafter be referred to in the alternative by those terms. Lessor opposes the present motion.

Almost from the beginning of this Chapter 11 case, debtor gave attention to the problem of continued occupancy of its premises. Indeed, in its first motion in connection therewith, debtor said that it was because of the efforts of lessor to regain possession of the premises that the bankruptcy case was filed. From the spring of 1985 through the fall of 1985, numerous settings were made and continued as the parties attempted to negotiate an agreement which would permit debtor's continued occupancy. These efforts ultimately proved fruitless and, thereupon, the present motion finally came on for hearing.

The facts about debtor's occupancy of the subject premises are not in dispute. At the hearing, the parties made a stipulation on the record as to the amount of rent arrearage owed by debtor to lessor. While the original lease between the parties was not put in evidence, evidently because it is no longer in force between them, it apparently was entered into on December 17, 1980. (See reference in first WHEREAS clause in First Amendment to Agreement of Lease, PX 1.) The premises in question are located at 1705 Magnolia Lane, Lincoln Heights, Ohio. The building contains some 30,000 square feet of space. The building was newly constructed when debtor entered into occupancy. Its original lease was for 15,000 square feet of the space of the building. The First Amendment (PX 1) was entered into on July 21, 1981, and provided that debtor would take over occupancy of the entire building. The term of the lease is for five years from the date of the First Amendment. Such First Amendment contains an option to renew for an additional five years, and also includes an option to purchase at a price varying, depending on whether the option is exercised in the third, fourth or fifth year. (See Article 24 of the First Amendment.) The option to purchase requires that lessee not be in default at the time of exercise of the option.

The parties entered into a Second Amendment to Agreement of Lease on February 22, 1985 (PX 2). The Second Amendment was entered into when a lessee other than debtor was found who was willing to lease some of the space in the subject building. This second tenant leased 12,000 square feet. The Second Amendment contained representations that lessee had been unable to pay the full rent for the entire 30,000 square feet of premises; that the parties had orally agreed to reduce the space occupied by debtor; and that because there would now be two tenants, contractual provision had to be made with respect to joint use of common areas. The Second Amendment, then, made appropriate provision so that the existing lessor and lessee could adjust to the coming into occupancy of a second tenant and, in addition, reduced the monthly rental which debtor was obligated to pay to lessor, such reduction to commence March 1, 1985.

The Second Amendment, however, did not deal with the substantial rent arrearage due to lessor from debtor at the time of this agreement. The dollar amount of

rent to be paid is provided for in the First Amendment where it is stated as $2.80 per square foot for the first and second year (annual rent $84,000.00); $4.00 per square foot for the third year ($120,000.00 annual rent); and, $4.50 per square foot for the fourth and fifth years ($135,000.00 annually). There are serious disputes between the parties, first, as to what rent was required during the period between September 1984 and the filing of the bankruptcy case on April 9, 1985, and second, as to what rent was paid during that period. It is not disputed, however, that debtor has remained current in its rent payments since the case was filed. (This is our conclusion from the record, but the record is not free of confusion. For May and June, 1985, debtor paid $6,000.00 in rent which is consistent with the amount identified as "September rent" in lessor's letter to debtor of September 18, 1984. The origin of this figure is obscure, and made more so if one applies the contention of lessor that the parties are governed by the two Amendments to Lease. From those documents, at this time in the life of the lease arrangement, debtor should be paying $4.50 per square foot, and the area with which these documents show debtor is charged with occupancy is 18,000 square feet. These components do not yield $6,000.00 in rent, and yet this is the amount demanded by landlord. For July, August, and September, 1985, debtor paid $6,750.00 per month. The derivation of this figure is consistent with $4.50 per square foot for 15,000 square feet. We infer from this that the parties reached agreement that debtor is no longer charged with responsibility for the 3,000 square feet it does not require and which the second tenant did not lease.)

An issue of fact was presented to us as to whether the letter agreement proposal addressed to debtor from lessor dated September 18, 1984 was in fact agreed to by the debtor. Norman Robinson, president of debtor, testified that he had signed it, but lessor's witness said that he had never seen a signed copy prior to the hearing. It is not necessary for us to resolve this dispute because it is clear from our examination of the record of checks paid by debtor to lessor that the proposal in the September 18, 1984 letter which would call for $9,000.00 a month in rental payment ($6,000.00 current rental plus $3,000.00 per month on account of back rent payments) was not observed. That is, the total paid by debtor in September, 1984 was $6,000.00; for October, $6,000.00; for November, $4,000.00; for December, $4,000.00; for January, 1985, $6,500.00; in February, 1985, five payments totalling $12,000.00; and for March, 1985, $8,000.00. The only fair conclusion we can draw from the record of payments by debtor is that they have been various in amounts, and evidently represent the amount that debtor was able to pay in any given month. While much was made by the parties as to their respective behaviors regarding rent prior to the bankruptcy filing, all that can fairly be said is that debtor made what payments it could, and as of the date of filing of the bankruptcy, the parties stipulated that there was an arrearage owed by debtor to the landlord of $156,050.00, including debtor's security deposit, and lessor's attorney fees and interest.

The foregoing deals with the current relationship between the parties. In addition to evidence about such matters, at the hearing evidence was offered regarding debtor's view of the future. There was offered into evidence a commitment letter from a prospective investor to loan debtor $135,000.00. Such commitment letter contains conditions regarding requisite security interests, including a requirement for subordination of the position of First National Bank of Cincinnati. No evidence was shown that an agreement to subordinate was forthcoming. Beyond this commitment, debtor offered evidence of its business prospects. The purpose of this showing for present purposes is to persuade that debtor can, contrary to past experience, pay its monthly rent, i.e., adhere to the terms of the lease agreement proposed to be assumed.

To support this position, debtor relies first on the fact that all rent has been paid

for 1985. In addition, it contends that its evidence reveals a substantial increase in its business sales over the previous year. It increased its shot-peening operations in 1985. Due to larger purchase orders from Rockwell International and an increase in business from General Electric, its shot-peening operations will be operating at nearly 100% of capacity over three shifts. In this connection, it must be appreciated that the premises occupied by debtor were especially constructed to house debtor's shot-peening equipment and moving such equipment would involve an expense of some $500,000.00. Robinson, debtor's president, testified about his recent dealings with Rockwell International in respect to shot-peening of aircraft wing components, of their acceptance of debtor as an important resource, and the prospect of income from that source. In addition to shot-peening, debtor expects early next year to begin a program for the United States of building portable electronic calibration units for the field testing of aircraft under a set-aside contract through the Small Business Administration. It is expected that this arrangement will be lucrative for debtor.

The basic law with which we must deal is statutory and is to be found at 11 U.S.C. § 365:

§ 365. Executory contracts and unexpired leases

\* \* \* \* \* \*

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

\* \* \* \* \* \*

Debtor proposes to meet the requirements of this statute by the provisions of its plan of reorganization which has already been filed. As has been stated, the parties have stipulated that the rent arrearage amounts to $156,050.00. In its plan, debtor proposes to cure this default by making 60 equal annual installments with interest at 10% per annum. As to the requirement for adequate assurance of future performance, debtor's plan calls for a security deposit to lessor in the amount of $13,500.00, representing the equivalent of two months' rent, such deposit to be made no later than 30 days after confirmation. Landlord contends that the proposal for curing the default is not a "prompt" cure. In addition, landlord says that there is not adequate assurance of future performance notwithstanding debtor's predictions of a rosy future.

We must apply the above quoted statutory provisions to the facts before us. In doing so, we notice first that debtor is not proposing to meet the requirements of § 365(b)(1)(A) by a procedure related to "cures", the first word of that clause. There seems little doubt that what the statute there contemplates is a forthwith payment of any arrearage.

Instead, debtor's proposal arises under the language which follows after the disjunctive, "or". That following clause has two components, (1) that debtor shall "promptly cure"; and (2) that debtor give "adequate assurance" that the prompt cure which he promises will indeed be implemented. So we must answer the question, does the proposal for cure of the $156,-050.00 arrearage over a five-year period meet the "promptly" requirement? On the one hand, landlord contends that it does not, that the statute requires an immediate and complete cure at the time of assumption. Debtor asserts that the statute must be interpreted more flexibly than that. In a general way, we agree with the latter

assertion for, as we have seen, we deal here with an alternative to the first word of the § 365(b)(1)(A), "cures", and we believe that that word, that first alternative, comprehends this position of landlord. In addition, a review of the pertinent cases indicates that the flexibility urged by debtor is the prevailing view. At the same time, we are impelled to the conclusion that the flexibility sought by debtor is excessive.

An appropriate preliminary remark as we approach the present question is:

\* \* \* the purpose behind chapter 11 is "to permit successful rehabilitation of debtors" and "to prevent a debtor from going into liquidation." *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984). \* \* \* Specific provisions of the Code should be interpreted with this goal in mind. *Moody v. Amoco Oil Company,* 734 F.2d 1200, 1216 (7th Cir.1984).

The court in *Moody* utilized the quoted observations as a general admonition that interpretation of Code provisions relating to Chapter 11 should further the reorganization purposes of the statute.

We do not believe that the position urged by landlord in the present case is consistent with such an objective. Instead, flexibility requires that, in a proper case, a period of time be allowed for the liquidation of a default. Those cases which specifically have addressed the question have so held. *General Motors Acceptance Corp. v. Lawrence, et al.,* 11 B.R. 44 (Bankr.N.D.Ga. 1981); *In re Berkshire Chemical Haulers, Inc.,* 20 B.R. 454 (Bankr.Mass.1982); *In re Coors of North Mississippi, Inc.,* 27 B.R. 918 (Bankr.N.D.Miss.1983). The court in *Coors* permitted a cure of default over a three-year period, but in doing so, in the situation before it which involved the intervention of an assignee, it found that the assignee had a "reputation of outstanding financial strength and integrity" and that approval of the cure "may well result in a long-range business enterprise mutually profitable to each such assignee" and to the lessor. The court found the three-year

period to be appropriate because it compared it "to the prospective longevity of successful business operation" of the rehabilitated distributorship.

The *Berkshire Chemical* case, while recognizing that a prompt cure could take place over an extended period of time, reasoned that what was prompt could depend upon the length of the proposed relationship between the parties. The court then said:

\* \* \* However, what is a prompt cure can often vary according to the circumstances of a given case. \* \* \* For instance, a debtor with 90 years remaining on a 99 year lease, who proposes to cure its arrearage by monthly payments over an 18 month period, might be found to have offered adequate assurance of a "prompt" cure. On the other hand, where in this case the debtor's offer to cure its lease default over the next 18 months contemplates the final payment being made contemporaneously with the expiration of the lease term, I cannot say that any Court, under any circumstances, would find that such a proposal qualifies as a "prompt" cure under § 365(b)(1).

*Id* at 458.

Thus, the court, in the circumstances of that case, held that the facts did not spell out a "prompt" cure. That conclusion was reinforced by the further facts that there was no past history of profitability, nor competent evidence of future profitability.

■ We find the case before us comparable to the *Berkshire Chemical* case. Because the proposed payment period for the cure is virtually co-extensive with the claimed remaining life of the lease, it cannot be said, consistent with the reasoning of the court in *Berkshire Chemical,* that the period of payment is sufficiently less than the complete period of the relationship between the parties that it is "prompt" cure.

Nor are we satisfied that there is adequate assurance that any cure will be effected by debtor. While debtor, for the past several months, has paid what appar-

874

ently is agreed between the parties is debtor's regular monthly rent, it has not made the $3,000.00 per month payment on arrearage which it claims was its agreement with debtor. Moreover, our review of the record information available to us suggests that debtor did not have the capability of making such payments. Thus, there is far less than adequate assurance that debtor has the capability even of curing the default at the rate which it has proposed.

We, therefore, have reached the conclusion that debtor should not be allowed to assume the defaulted lease with the landlord because it is unable to comply with the requirements of 11 U.S.C. § 365(b)(1)(A).

We reject the arguments of debtor for a different outcome. The first contention, that the asserted September 18, 1984 letter agreement binds landlord to acceptance of a cure at the rate of $3,000.00 per month, we find to be without merit. Even if that document did represent an agreement between the parties, it was not complied with by the debtor. The further position of debtor that the 60 month cure proposed is "reasonable" is simply not appealing, where this is virtually the entire life of the lease.

Accordingly, debtor's application to assume the lease is denied. The foregoing constitutes our findings of fact and conclusions of law.