**In re BYGAPH, INC., Debtor.**

**Bkrtcy. No. 84B11550.**

United States Bankruptcy Court, S.D. New York.

Jan. 10, 1986.

---

Maloney & Porcelli by Joseph E. Porcelli, New York City, for debtor.

Finkel, Goldstein & Berzow by Harold S. Berzow, New York City, for 2160 Broadway Corp.

Weisman, Celler, Spett & Modlin by Samuel Rudey, New York City, for Citibank, N.A.

Howard Gotbetter, New York City, for Border Cafe West Corp., intervenor.

## CORRECTED OPINION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The debtor-in-possession, Bygaph, Inc. ("Bygaph"), seeks an order of this court permitting it to assume and assign a lease and to sell the furniture, fixtures, and equipment located on the premises pursuant to §§ 363(f) and 365 of the Bankruptcy Code, 11 U.S.C. §§ 363(f), 365 (1984) (the "Code"). The motion is opposed by 2160 Broadway Corp. (the "Landlord"), by Border Cafe West Corp. ("Border West"), which entered into a subsequent lease for the same premises and was permitted to intervene in opposition, and by Citibank N.A., holder of a security interest in the equipment and fixtures. By order of November 21, 1985, this Court granted the motion. This opinion sets forth the reasons for that decision.

I

R.M.R. Restaurant Corporation ("RMR") leased certain restaurant premises located at 76th Street and Broadway in Manhattan from the Landlord prior to October 14, 1981. On that date, RMR entered into an agreement with Bygaph whereby it contracted to sell the restaurant to Bygaph and Bygaph agreed to pay cash and certain rent arrearages, and also to make payments on loans made to RMR including obligations to Citibank N.A. and National Westminster Bank USA. At the same time, the RMR lease was terminated and Bygaph entered into a fifteen year lease for the premises directly with the Landlord (the "Lease").

A modification to the agreement was agreed to on March 19, 1982, changing the purchase price and affording RMR with security for Bygaph's obligations to it. Pursuant to that modification, Bygaph, on April 8, 1982, granted RMR a security interest in the chattels and fixtures on the restaurant premises, assigned the Lease to RMR, and received a sublease providing that Bygaph agreed to pay, as part of its rent obligations, the sums owed the banks. Concurrently, RMR reassigned the paramount Lease to the debtor. The reassignment was to be held in escrow pending Bygaph's satisfaction of its contracted obli-

gations to RMR. None of these documents was recorded.

In June, 1984, both Citibank and National Westminster Bank apparently informed RMR that certain payments on the respective loans had not been made. The Landlord contends that, pursuant to the sublease, RMR notified Bygaph by letter of June 26, 1984 of the defaults, and that unless the defaults were cured within five days of the receipt of the letter, the sublease would expire on July 6, 1984. Bygaph disputes receiving the letter.

RMR, on July 11, 1984, brought an action in the Supreme Court of the State of New York, County of Delaware, seeking a declaration that the sublease be declared null and void and terminated as of July 6, 1984. The state court entered an order granting RMR's motion for summary judgment on September 26, 1984, holding Bygaph in default because its answering papers were delivered to the courthouse one hour after the motion was submitted. Bygaph immediately moved to vacate the default. In a decision dated November 23, 1984, and by order entered December 12, 1984, the court granted the debtor's motion to vacate the default judgment only to the extent that money damages had been awarded. It refused to vacate that portion of the motion which rendered the sublease null and void and entitled RMR to take possession of the premises. Bygaph appealed.

The restaurant was closed in August, 1984, leaving no indication of Bygaph's or RMR's interest in the premises. Bygaph filed a Chapter 11 petition on November 4, 1984. On February 10, 1984, it sought this Court's approval to assume and assign its lease pursuant to § 365 of the Bankruptcy Code, and to sell substantially all its other assets, pursuant to § 363(f) of the Code, to Broadway Beach Corp. RMR, implicitly relying on § 365(c)(3) of the Code, objected to the motion on the ground that this lease of nonresidential real property could not be assumed because it had terminated under applicable non-bankruptcy law prior to the order for relief, and that the state court's

order of September 26, 1984 had provided RMR with possession of the premises.

The debtor, in response, asserted that its relationship with RMR was not truly a landlord-tenant relationship, but was rather more in the nature of a security agreement, and that consequently a termination of the sublease agreement did not terminate the leasehold. Secondly, it argued that even if its leasehold was deemed terminated, this Court should revive it based on equitable considerations.

The landlord also objected to the motion on the ground that the proposed assignee, a corporation owned by one Albert H. Socolov, had not furnished adequate assurance of future performance as required by § 365(f)(2)(B) of the Code. At a hearing held on March 18, 1985, Mr. Socolov testified as to his ability to provide such assurance.

The testimony revealed that Socolov, who is a practicing attorney, is also a successful restaurateur. He owns and profitably operates a Mexican restaurant in lower Manhattan called The Beach House. Among the financial assets available to Mr. Socolov are $237,000 in an insured market rate account, and securities worth $423,000 at the time of the hearing. In addition, he stated that The Beach House grosses approximately $60,000 per month during the spring and the fall, which are its peak business periods. He testified that he had not been as much as a month late on his rent obligations in connection with The Beach House.

To this, Socolov added that he had budgeted approximately $275,000, entirely from his personal assets, to capitalize Broadway Beach Corporation and thereby enable it to purchase the restaurant from the debtor and open a new Mexican-style restaurant on the premises. $166,000 was to be used for the purchase of the establishment, leaving an excess of $110,000. $75,000 of this amount would be used to restore the premises, and the remainder would serve as a reserve fund. Socolov projected that he would lose approximately $10,000 per month initially on the restau-

rant before it became profitable. He also indicated that he was willing to dedicate funds in excess of the above-mentioned $275,000 if they were needed. Purveyors supply The Beach House on credit and Socolov has no doubt that he would receive credit for another restaurant. Were his corporation permitted to obtain the lease, Socolov would devote some of his time to running the restaurant with either his wife or son having full time management responsibility. Employees from The Beach House would staff the new restaurant.

In an unpublished opinion dated April 22, 1985, a motion to assume the Lease was denied on the basis of the state court decision then outstanding, which provided that the debtor's interest in the sublease had terminated and that RMR was entitled to possession. This Court, absent reversal or appeal of that decision, was unable to revisit it to determine on the merits whether the debtor's sublease was rightly terminated. *In the Matter of Bygaph Corporation*, No. 84 B 11550, slip op. (Bankr.S.D.N.Y. April 22, 1985). For this reason we did not rule on the issue of whether adequate assurance of future performance had been furnished or whether Bygaph, as debtor-in-possession, could void the assignment.

Shortly thereafter, RMR purported to surrender the Lease to the Landlord without apparent consideration by turning over the keys at the end of April, 1985, and delivering a document, dated May 9, 1985, which provided:

> R.M.R. RESTAURANT, INC. for good and valuable consideration hereby surrenders to 2160 BROADWAY CORP. any and all interest in lease to premises situated at 2160 Broadway, New York City held by reason of interest in lease dated October 14, 1981.

The Landlord thereupon, on September 11, 1985, entered into a lease of the restaurant premises with Border West, which included a provision for the lessee to pay additional rent of $50,000 in cash in ten days and $50,000 in promissory notes (the "Border West Lease"). This sum was cal-culated to make up the arrears owed by Bygaph to the Landlord. Charles Leaness, president and director of Border West, testified that he was referred to the landlord by a Dr. Michael Wiland, a principal of RMR, who set up a meeting between Leaness and the landlord. Leaness stated that his inspection of the premises before entering into the Border West Lease did not indicate any interest of Bygaph or RMR in the leasehold. He added that he knew Wiland had an interest in the equipment and fixtures and that Border West had assumed RMR's obligation to the two banks in order to obtain them.

The Border West Lease, however, revealed that Wiland also had an interest in the subject property. Clause 67 provides that:

> It is understood and agreed that the interest of Dr. Michael Wiland and his associates must be resolved to his satisfaction and his approval to this lease shall be required.

The Border West Lease itself makes clear that this interest is an interest in the leasehold, and not just the fixtures as Leaness claimed. Paragraph 62 of the lease provides that the Landlord does not own the fixtures, and paragraph 63 conditions the lease upon Border West's obtaining title to them. Border West nevertheless asserts that it did not know of the state court litigation between RMR and Bygaph, the litigation in this Court, or any other facts. It does not claim to have made any inquiry of either the nature of Wiland's interest, by whom the arrears were owed, or why the prior restaurant had failed.

On September 26, 1985, the New York State Supreme Court, Appellate Division, Third Judicial Department vacated the default judgment against the debtor in its entirety, reversing the lower court's determination that RMR had rightful possession of the property. Bygaph thereupon brought the instant motion seeking to assume and assign the Lease to Socolov's corporation. Bygaph would satisfy the Citibank and National Westminster secured claims by paying $12,970.00, the value of

the fixtures and equipment set forth in an appraisal submitted by Citibank. Evidentiary hearings were held; the parties stipulated to the admissability of Socolov's prior testimony. The parties agree that the rent is in default in the amount of $124,500.00 through October plus rent until closing.[1]

## II

Citibank objects to the debtor's motion on the ground the Lease is to be deemed rejected by virtue of section 365(d)(4) of the Code.[2] This section, added to the Code pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, 98 Stat. 333 (1984), sets forth a sixty day time period from the order of relief, subject to extension granted within that period for cause by the court, in which a debtor-in-possession must assume or reject an unexpired lease of nonresidential real property. A lease that is not assumed within these time parameters is deemed rejected.

■ We hold that the debtor's application to assume and assign, under these circumstances, does not run afoul of § 365(d)(4). The Appellate Division's September 26, 1985 decision to vacate the default judgment against the debtor effectively reinstated whatever ability Bygaph had to assume and assign the Lease. The debtor's current motion was made well within sixty days of that decision.

1. The Landlord claims that the boiler is in disrepair, pipes are broken and that Bygaph has the obligation to repair them. Bygaph disputes the allegation. The parties agree that if the obligation exists, it is curable. A further hearing in this regard is necessary. Proceeds in addition to the amount necessary to pay back rent are to be held pending further order of the Court.

2. Section 365(d)(4) provides:
 Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.
 11 U.S.C. § 365(d)(4) (1984).

As the Landlord notes, it is plainly apparent that Congress hardly envisioned this set of circumstances in enacting § 365(d)(4). The legislative history indicates that Congress sought to relieve landlords of some of the uncertainty and delay inherent in lease assumption decisions, and to decrease the attendant problems of extended vacancies and partial operation of tenant space by bankrupt tenants. *In re By-Rite Distributing, Inc.,* 47 B.R. 660, 665, 12 B.C.D. 1082, 12 C.B.C.2d 253 (Bankr.D.Utah 1985); 130 Cong.Rec. S8894–95 (daily ed. June 29, 1984) (remarks of Senator Hatch). Bygaph's promptly making its motion after the Appellate Division ruling accords with that policy.

In the same breath, Congress evinced a concern for federalism and recognized the dual system of federal and state courts by precluding assumption if a

> ... lease of nonresidential real property has been terminated under applicable non-bankruptcy law prior to the order for relief.

§ 365(c)(3). Permitting the sixty day period of § 365(d)(4) to preclude assumption under these circumstances would deprive the state court system of the power to correct its own errors or force it to act with undue haste. Understandably, there is not the slightest indication that Congress intended such a result.[3]

3. In *In re By-Rite Distributing, Inc.,* 47 B.R. at 669, relied on by Citibank, the court strictly construed § 365(d)(4) and held that an unexpired lease of nonresidential property could not be assumed when the motion to assume was filed within the sixty day period but the hearing was held after the period had expired. With respect to the latter requirement, that decision is questionable given the heavy calendar of this Court where at least this judge hears an average of 130 motions a month. The *By-Rite* court's requirement of a conscious decision to assume, evidence of the ability to do so, and manifestation of judicial approval, moreover supports our interpretation of the statute in this case. All three of these elements are present here. The debtor's decision to assume is unquestionably clear and is evident from the timely motion it brought soon after the Appellate Division's decision. We also hold, *infra,* that the assumption requirements of § 365(b)(1) are satisfied. As to

Of no merit is the Landlord's fleeting suggestion that the debtor-in-possession should have posted a bond to preserve its state court appellate rights and thereby preserve the Lease for the benefit of the estate. How the posting of a bond would affect the timeliness of the motion is not apparent. As is set forth, *infra*, the debtor may avoid the assignment of the Lease to RMR under § 544 of the Code. That section requires no bond. Furthermore, debtors-in-possession often lack such resources and Congress has accordingly exempted them from the analogous bond requirement of Rule 65(c) of the Federal Rules of Civil Procedure. *See* Rule 7065 of the Rules of Bankruptcy Procedure. For these reasons we hold that the motion is timely.

### III

In addressing the merits of the motion, the Landlord asserts that the sublease was terminated on July 6, 1984, pursuant to Bygaph's failure to perform an alleged conditional limitation of payment of RMR's obligations to Citibank and National Westminster Bank, and that RMR therefore had full rights to the Lease pursuant to the assignment it received. Bygaph denies that state law requirements of notice of termination were fulfilled, and asserts that the documents taken together are nothing more than a security device entitling RMR only to the rights of a secured creditor. It further asserts that it, as debtor-in-possession, has the rights of a bona fide purchaser under § 544(a)(3) of the Code and that notwithstanding the purported termination of the sublease, the assignment is thereby voidable.

Section 544(a) of the Code, in pertinent part, provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of

the debtor or any obligation incurred by the debtor that is voidable by—

. . . .

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

. . . .

11 U.S.C. § 544(a)(3).

A debtor-in-possession can avoid an assignment of an interest in real property under this section if a hypothetical bona fide purchaser on the date the bankruptcy case was commenced could do so. *McCannon v. Marston*, 679 F.2d 13 (3rd Cir.1982); *In re Euro-Swiss International Corporation*, 33 B.R. 872, 11 B.C.D. 113 (Bankr.S.D.N.Y.1983); *In re Hardway Restaurant, Inc.*, 31 B.R. 322, 10 B.C.D. 1063 (Bankr.S.D.N.Y.1983). The definition of a bona fide purchaser and the powers which it may exercise are governed by the substantive state law pertaining to the subject property. *In re Euro-Swiss International Corporation*, 33 B.R. at 879. In New York, a bona fide purchaser must have purchased the property "in good faith *without notice* and for valuable consideration." *E.g. In re Hardway Restaurant, Inc.*, 31 B.R. at 327. Under New York law, such notice consists of actual notice and

constructive notice of what may be revealed by: (i) an examination of the record, *e.g., Andy Associates v. Bankers Trust Co.*, 49 N.Y.2d 13, 424 N.Y.S.2d 139, 399 N.E.2d 1160 (1979), (ii) reasonable inquiry of those in actual possession, *see Wardell v. Older*, 70 A.D.2d 1008, 418 N.Y.S.2d 196 (1979), or (iii) reasonable inquiry on the basis of all the circumstances. *See In re Hardway*, 31

the third element expressed in *By-Rite,* judicial approval of the assumption within sixty days of the determinative state court reversal comports

with the Congressional intent underlying the statute and does not undermine the purpose of its express automatic rejection mechanism.

B.R. 322, 10 B.C.D. 1063, 1068 (Bkrtcy.S. D.N.Y.1983). *In re Euro-Swiss International Corp.* at 882. As the statute provides, the debtor-in-possession's actual knowledge is ruled out.[4] But a trustee or debtor-in-possession is subject to constructive notice as opposed to knowledge. "The choice of that term rather than the broader term 'notice' ... indicates that Congress did not intend to shield the trustee under § 544(a)(3) from the effect of constructive notice." *Id.* at 881.

■ Here, an assignee of the Lease on the date the bankruptcy petition was filed would have learned nothing from examination of the record because none of the documents were recorded. Nor would notice of the assignment by Bygaph to RMR have been revealed from examination of the premises or inquiry of those who were found there, for the restaurant was boarded up and there was no indication on the property that any third party was in possession or might have had an interest in it. *Compare, Euro-Swiss,* 33 B.R. at 883. Indeed the record before us reflects no circumstances that would give notice to a hypothetical purchaser in November 1984 or cause it to make further inquiry. The assignment of the Lease to RMR is thus avoided and the Lease assumable and assignable provided that the standards set forth in § 365 of the Code are met.[5]

## IV

As to Bygaph's ability as debtor-in-possession to satisfy those standards, Border West and the Landlord assert that assumption and assignment are precluded by the Landlord subsequently having entered into a lease with Border West, and because, in their view, the requisite adequate assurance of future performance required by § 365(b) and § 365(f) has not been met.

■ Nowhere in § 365 is it expressly provided that the ability to assume and assign a lease is constricted by the landlord's having let the premises to another tenant. Section § 365(c)(3)'s limitation of

---

4. Section 544(a) states that the grant of the avoidance power to the trustee is not conditioned on any knowledge of the trustee or of any creditor. This "without knowledge" provision refers to actual notice to the trustee. *In re Euro-Swiss International Corporation,* 33 B.R. 872, 881.

5. In light of the application of the debtor-in-possession's power under § 544(a)(3) to avoid the assignment of the lease to RMR, we need not reach the issue of whether the assignment was a security device, nor rule on the Landlord's contention that the Lease was irrevocably terminated as a result of the debtor's default on his obligation to make payments to Citibank pursuant to the terms of the sublease between RMR and Bygaph, and its failure to cure the default. *See First National Stores v. Yellowstone Shopping Center,* 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968). In *Yellowstone* the tenant had failed to secure a temporary restraining order that would have sustained the status quo until after the period provided by the lease for curing the default had expired. Without the timely invocation of a *Yellowstone* injunction, the lease terminated as per its terms, and the Court of Appeals ruled that it could not be revived.

Such a resolution would involve not only the factual issue of whether notice of termination had been given, but also the legal issue of whether § 365(c)(3), precluding assumption if a lease has been terminated under state law, applies in view of the purported termination of the sublease pursuant to a conditional limitation which is not favored, and in view of the curative provisions of §§ 365(b)(1)(A) and 1124(2)(A) of the Code. *See, In re Taddeo,* 685 F.2d 24, 26, 9 B.C.D. 556, 6 C.B.C.2d 1201 (2d Cir.1982). ("Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences [of the default] are thus nullified."); *Matter of Kaiser,* 22 B.R. 383, 387 (Bankr.W.D.Pa.1982) ("... the postulations under which defaults can be cured and adequate protection provided for ... would be meaningless if rights under leases and contracts should be considered terminated by pre-petition defaults in such manner as not to be subject to said curative provisions."); and regarding § 1124: ("... The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain. Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims.") Senate Report No. 95–989, 95th Cong., 2d Sess. 120 (1978), U.S.Code Cong. & Admin.News 1978, p. 5906.

the ability to assume a lease in nonresidential real property in the absence of termination pursuant to state law differs conceptually from the notion that an assignment or reletting of the premises to a bona fide purchaser may have terminated rights under a lease. Nevertheless, the rules regarding bona fide purchasers are too well ingrained in the law to be so easily shunted aside. To fail to recognize the presence of a bona fide purchaser would, moreover, significantly disrupt commercial and real estate practice. A bona fide purchaser should be protected absent indication in the Code to the contrary. It would furthermore be totally inconsistent not to recognize that where the timeliness of the debtor's motion under § 365 is to be calculated from the date of a post-petition state court ruling, the presence of a bona fide purchaser prior to that ruling would preclude the debtor-in-possession from assuming and assigning the lease.

■ Border West's claim to be such a bona fide purchaser is, however, unavailing. The evidence on this record overwhelmingly shows that they had more than sufficient constructive notice of Bygaph's interest in the property. Having learned from a principal of RMR about the availability of the premises, it had reasonable cause to inquire about RMR's interest and thereby could have learned of RMR's arrangement with Bygaph. Indeed, Border West's lease with the Landlord was conditioned on satisfying the interest of Wiland and his associates at RMR. In the course of determining what would be required to discharge that condition, Border West would surely have learned of the pendency of Bygaph's appeal.

Not to the contrary is RMR's having previously executed a surrender of lease in May, 1984. The Border West Lease was prepared some three or four months later

and the presence of the condition is more than a sufficient indication of the Landlord's, and apparently RMR's, concern as to the efficacy of that document.

Nor does Leaness' implication that he thought RMR's interest was limited to the fixtures withstand even the most cursory examination. The Border West Lease is expressly conditioned on obtaining title to the fixtures and satisfying Wiland and his associates. Even were Leaness' testimony to be accepted, moreover, it would seem that under the circumstances a reasonably prudent prospective tenant had cause at least to inquire as to whether the owner of the fixtures had any extant interest in the premises themselves.

These circumstances include the condition to the Border West Lease, contained in the same clause as the fixture and equipment obligation, that requires Border West to make $100,000 in additional payments. The testimony of the Landlord revealed that these payments were for rent arrearages owed by Bygaph to 2160 Broadway Corporation. Although they are not labeled as such, the organization of the Border West Lease indicates that the sums enumerated do not represent rent, which is clearly and fully provided for by a separate rent rider, but merely supplemental payments due to the Landlord, styled "additional rental," the payment of which is in some manner related to the tenant paying for the fixtures. While this clause does not expressly state that Border West must pay rent arrearages, its wording, when read in the context of the surrounding clauses and the lease as a whole, constitutes a circumstance which should have prompted an inquiry concerning the reasons for the requirement and who owed the rent arrearages, and thus should have induced further inquiry by the prospective lessee as to whether there were prior unrecorded interests in the property.[6] With the circum-

6. These interests are distinct from the former interest of RMR referred to in the Lease of October 14, 1981 which was subject to RMR's surrender of its earlier lease of July 7, 1978. Unlike the situation with Bygaph's interest, the record contains no suggestion that the condition

was not fulfilled and a bona fide purchaser would have little if any reason to inquire since there was nothing that would indicate that Bygaph was not in possession or that there existed a subsequent unrecorded assignment. The clauses of the Border West Lease gave notice of

stances here demanding reasonable inquiry that would have disclosed Bygaph's interest, Border West cannot be said to be a bona fide purchaser.

Accordingly, we turn to the requirements for the assumption and assignment of an unexpired lease provided by § 365 of the Code. Section 365(b) sets forth the requirements a debtor must satisfy in order to assume an unexpired lease in which there has been a default. Section 365(f)(2)(A) provides that the debtor may assign the lease only if it first assumes it in accordance with the requirements of the applicable provision of § 365, which in this case would be § 365(b)(1), and adequate assurance of future performance by the assignee is provided pursuant to § 365(f)(2)(B).

The debtor's proposal, as stated in its motion, cures all rental defaults on the Lease by paying $124,500.00 to the Landlord, plus rent until closing, in cash upon assumption and assignment. Proceeds sufficient to pay other alleged defaults are to be received and held. *See* n. 1 *supra*. The only issue presented concerns adequate assurance of future performance under the Lease. Adequate assurance is required by both the assumption and the assignment provisions of § 365. In this case, "... the assurance tendered by the debtor upon the assumption of the lease is the prospective performance of the assignee..." *In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 9 C.B.C. 2d 430 (Bankr.S.D.N.Y.1983). Satisfaction of the requirements of both §§ 365(b)(1)(C) and 365(f)(2)(B) thus depends on whether the prospective assignee can provide adequate assurance of future performance.

 Congress intended that the words "adequate assurance" be given a practical, pragmatic construction, and is to be determined under the facts of each particular case. *In re Sapolin Paints, Inc.*, 5 B.R. 412, 420–21, 6 B.C.D. 776, 2 C.B.C.2d 854 (Bankr.E.D.N.Y.1980). While Congress intended to favor assumption and assignment of leases as a means of realizing value for the estate and aiding it in its progress

towards rehabilitation, *In re Evelyn Byrnes, Inc.*, 32 B.R. at 829, the statute also protects landlords and lessors. *In re Natco Industries, Inc.*, 54 B.R. 436 (Bankr. S.D.N.Y.1985). Defaults must be cured and compensation must be made for pecuniary loss, or adequate assurance of a prompt cure or compensation for such must be given. No guarantee is required but the lessor must be given adequate assurance of future performance so that it will be protected from having to take on the burden of a tenant who may be likely to default on his lease obligations after the assumption and assignment have occurred. *In re Natco Industries, Inc.*, at 440–41. The emphasis is on protection; the assumption and assignment process is not designed to afford a landlord with a benefit in addition to that which he originally bargained for under the original lease. *In re Webster Clothes, Inc.*, 36 B.R. 260, 264, 10 C.B.C.2d 1055 (Bankr.D.Md.1984).

 The chief determinant of adequate assurance of future performance is whether the rent will be paid. *In re Natco Industries*, at 440–41; *In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 829; *In re Brentano's Inc.*, 29 B.R. 881, 883, 10 B.C.D. 717, 8 C.B.C.2d 566 (Bankr.S.D.N.Y.1983); *In re U.L. Radio Corp.*, 19 B.R. 537, 542, 8 B.C.D. 1273, 6 C.B.C.2d 430 (Bankr.S.D.N. Y.1982); *In re Lafayette Radio Electronics*, 9 B.R. 993, 998, 4 C.B.C.2d 220 (Bankr. E.D.N.Y.1981); *In re Alipat, Inc.*, 36 B.R. 274, 278 (Bankr.E.D.Mo.1984). In this regard Mr. Socolov's personal financial resources and his expressed willingness to devote sufficient funding to the new restaurant in order to give it a strong likelihood of succeeding, coupled with his experience as an owner and operator of a successful restaurant after which he will model his new venture, indicate that the Landlord is adequately assured that the rent will be paid. While the assets of Socolov's corporate entity will initially be limited to the amount necessary to finance the restaurant he plans to open on the premises,

a current interest of RMR which would spark inquiry revealing Bygaph's current interest.

the direct personal involvement of members of his family with the day-to-day management of the restaurant and his expressed commitment on the record to contribute additional assets if needed strongly indicate that he will not permit the restaurant to fail. The Landlord here has been furnished adequate assurance as provided by § 365 of the Code.

## V

With respect to that portion of the motion seeking to sell the fixtures and equipment free and clear of the banks' liens,[7] § 363(f)(3) provides that the debtor-in-possession may sell the secured creditor's interest in the collateral property free and clear if "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property."[8] The secured creditor has the burden of proof under § 363(o)(2) to establish the extent of its interest, *i.e.* the value of the collateral. Its right to adequate protection is limited to the lesser of the value of the collateral or the amount of the secured claim. *In re Aegean Fare Inc.*, 33 B.R. 745, 748 (Bankr. D.Mass.1983); *In re Alyucan Interstate Corp.*, 12 B.R. 803, 808, 7 B.C.D. 1123, 4 C.B.C.2d 1066 (Bankr.D.Utah 1981); *La Jolla Mortgage Fund v. Rancho El Cajon Associates*, 18 B.R. 283, 286, 8 B.C.D. 1035 (Bankr.S.D.Ca.1982). That value is determined as of the date the petition was filed. *Aegean Fare*, 33 B.R. at 748. Under the Code, value is determined by the amount obtainable as a function of the means of disposition, including liquidation, available to the creditor under the circumstances. *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1020 (11th Cir. 1984); *In re Thomas Parker Enterprises, Inc.*, 10 B.R. 783, 788 (Bankr.D.Conn.1981); 3 *Collier on Bankruptcy*, ¶ 506.04, pp. 506–30—506–33. (15th ed. 1985).

Here, Citibank and National Westminster Bank have asserted liens of approximately $87,000.00, claiming to be secured lenders in that amount. The value of the collateral, however, is sharply disputed. To discharge its burden of proof, Citibank has submitted an appraisal that states that the collateral has a liquidation value of $12,970 and a "greater value in its [sic] present location as they are in place and connected to gas, electric and water services," and that Socolov, in August 1984, in connection with his prior offer, agreed to pay $30,428.70 for same. It also observes that Border West has agreed to pay some $87,000 for the collateral. This last assertion, however, is of little weight since it was made under the compulsion of that provision of the Border West Lease requirement of satisfaction of the owner of the fixtures who owed that sum to Citibank. There is no evidence that Border West would pay that sum separately for the collateral or were the debtor authorized to assume and assign the Lease as we have held.

As to the other values profferred, the difference of roughly $17,500 can be partly, if not wholly, attributed to the cost of removal and installation of replacement fixtures and equipment, as the Citibank appraisal suggests. A value of $30,428.70, moreover, is supported not only by Socolov's apparent valuation in August 1984 but also by the notion that disposal in accordance with the transfer of the premises, unburdened by coercion such as contained in the Border West Lease, would appear to be within the reasonable contemplation of a holder of a lien secured by this type of collateral. Citibank has offered neither testimony of such a contemplation, nor any evidence of being able to compel the Landlord to lease the premises only upon the condition that a prospective tenant obtain the fixtures for the full amount of the banks' debt. There is testimony by Leaness that the premises were in considerable

---

**7.** Citibank also asserts a lien on the lease. It, however, has offered no evidence that the lien was recorded and the debtor claims that it was not.

**8.** Citibank claims that the debtor must satisfy the other provisions of § 363(f). The use of the word "or," however, makes each of the provisions of that section disjunctive.

disarray in August 1985. Whether this condition affects more than the furniture which may have to be replaced and reaches the equipment and fixtures is not clear. Referring to the furniture, Leaness testified that, "It looks like a lot of stuff thrown downstairs." The Landlord claims that pipes are broken. The inference that some of the fixtures and equipment may need repair or refurbishing, together with the apparent nature of the furniture, does belie a valuation of $87,000. It does not, however, contradict a valuation of $30,-428.70 since there is no indication that the collateral in August 1984 was of a different condition than in August 1985.

Such a value, when added to the amount of $124,500.00 necessary to cure the rental default through October, and an additional rent of $6,000 for November, equals $160,-928.70, which is within the aggregate cash consideration of $150,000 plus a discounted value of $101,867.10 for the notes, even were the debtor obligated to repair the boiler and pipes.[9] The conditions of § 363(f)(3) thus being satisfied, the collateral may be sold with the lien attaching to the proceeds pending further order of this Court. Under the legislative history, adequate protection would apparently be thereby furnished to the banks for the value of their lien. *See* H.R. No. 95-595, 95th Cong., 1st Sess. 345 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6301.

But § 363(e) of the Bankruptcy Code provides that the court shall condition the sale of property by the trustee to provide adequate protection for an interest which an entity holds in the property. Adequate protection, as defined by § 361(3) to include indubitable equivalence, is broader than the attachment of a lien to the proceeds of a note. Although the legislative history noted above refers to proceeds rather than

cash, on reconsideration it appears that adequate protection here could only contemplate continuance of the lien to assure the receipt of the value found.

The foregoing constitutes findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

---

9. The notes are payable over five years, according to the terms of the notice of sale dated October 3, 1985. (Although Socolov's October 2, 1985 affidavit states that the notes are payable over six years, the terms of the notice of sale are binding since that notice was sent to creditors.) There is no evidence that the notes will not be paid and Citibank fails to so contend. Assuming equal monthly payments of $2,500 over five

years at a discount rate of 13½%, which equals the prime rate of 9½% as of November 21, 1985, LXV *Barrons,* No. 47, p. 131 (November 25, 1985), plus 4%, the notes have a discounted value of $108,649.14. At a discount rate of 16.42%, which is the national average unsecured loan rate for 24 month obligations for this week, *USA TODAY,* November 22, 1985, p. 1B, the notes have a value of $101,867.10.