**In re The GOLD STANDARD AT PENN, INC., Debtor.**

**Bankruptcy No. 86–02849K.**

United States Bankruptcy Court, E.D. Pennsylvania.

July 13, 1987.

---

Charles C. Coyne, Roger F. Perry, Philadelphia, Pa., for debtor.

Spencer Ervin, Jr., Philadelphia, Pa., for The Christian Ass'n of the University of Pennsylvania.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

Presently before the Court is the Debtor's Motion For Approval of the Assumption of its unexpired lease with the landlord of the premises which houses the Debtor's restaurant business pursuant to 11 U.S.C. § 365(b)(1). What we find to be unusual about the Debtor's Motion is that it not only fails to define the parameters of the default, i.e., the amount of rental arrearag-

es is not specified, but also the Debtor specifically asks that the Court *not* make a finding as to the amount of arrearages. Thus, the Debtor asks the Court to "merely" approve its proposed *method* of curing the arrearages. The landlord objects to this Motion on the basis that the Debtor has not met the requirements of § 365(b)(1). We are constrained to agree with the landlord and to deny the Debtor's Motion, although we do continue an interim Order in effect pending a determination of the arrearages, which we believe must be determined before we can make a ruling on such a Motion.

The Debtor is THE GOLD STANDARD AT PENN, INC. (hereinafter referred to as "the Debtor"), a corporation operating a restaurant located at 3601 Locust Walk, Philadelphia, Pennsylvania, on the campus of the University of Pennsylvania (hereinafter referred to as "the premises"). The Debtor, as the tenant, and the Christian Association (hereinafter referred to as "the C.A."), a non-profit corporation, as the landlord, are parties to an unexpired lease dated June 1, 1983, for a substantial portion of the premises, the subject of the within Motion. The term of the lease is for ten years with two five-year options to renew thereafter. At this point in time, there are six years remaining on the initial ten-year period.

The Debtor filed a petition under Chapter 11 of the Bankruptcy Code on June 10, 1986. On June 30, 1986, the C.A. filed a Motion for Relief from the Automatic Stay which was originally scheduled to be heard on July 30, 1986. By three separate agreements between the parties, this hearing was continued until October 20, 1986, at which time the Court heard this Motion along with the Debtor's Motion to extend the time within which to assume or reject the subject lease, which had been filed on July 28, 1986, and was also continued twice by agreement of the parties. Following the October 20, 1986, hearing on both Motions, we entered an Order: (1) granting the Debtor's Motion to extend the time in which to assume or reject the Lease until December 19, 1986; (2) directing the Debtor to make weekly rental payments of $1,750.00 as adequate protection instead of the rental payments of $1,350.00 per week which the Debtor was making; and (3) denying the C.A.'s Motion without prejudice to relist said Motion if the Debtor failed to comply with the other aspects of the Order.

On December 15, 1986, the Debtor filed the instant Motion for Approval of Assumption of the lease under certain proposed conditions. The said Motion also requested the interpretation of certain provisions of the lease and resolution of certain disputes over lease provisions. The Debtor filed therewith a proposed Order of five pages which detailed the terms under which the Debtor sought to assume the lease. On January 7, 1987, the C.A. filed its Answer objecting to the assumption of the lease on the proposed terms, asserting that (1) the Debtor was not making all payments currently due under the lease; (2) the Debtor's proposed order would impermissibly modify the terms of the lease respecting the sale of alcoholic beverages; and (3) the Debtor had failed to provide adequate assurance for payment of all arrearages in full.

In keeping with the practice of the parties in this case to agree to continuances while they attempted to resolve their differences, the original hearing date, January 7, 1987, was continued, by agreement, three times until a hearing was held on March 3, 1987. Thereafter, a briefing schedule was entered, allowing both parties the opportunity to file Briefs, the Debtor on or before March 24, 1987, and the C.A. on or before April 7, 1987, which were duly filed.

After we were prepared to render a decision, we decided to conduct a conference with the parties on June 18, 1987, to see if we could urge them to amicably resolve their differences. With the agreement of the parties, we delayed our decision to allow the parties such an opportunity to settle the matter. However, on July 6, 1987, we were informed by the C.A.'s counsel that "settlement could not be reached." Hence, it is necessary that we now proceed to make a disposition of the Debtor's Motion.

The subject lease, which is of record in this case, provides for three types of payments: (1) minimum rent of $70,000.00 per year, payable in monthly installments of $5,833.33 (or $1,350.00 per week); (2) an additional amount measured by two (2%) percent of gross operating revenues and an additional two (2%) percent of liquor sales; and (3) an additional payment of $29,167.00 for rents accrued prior to the Debtor's taking possession of the premises, payable in monthly installments of $1,000.00 which were to commence on June 1, 1985. Both parties agree that neither the second nor the third type of payments cited above have ever been paid by the Debtor to the C.A. In fact, a longstanding problem has been the Debtor's failure to provide the C.A. with reliable figures and records from which the second type of payments could be calculated. Thus, both parties assert a yet undetermined amount of arrearages as the crux of the default under the lease.

We begin our task by quoting 11 U.S.C. § 365(b)(1), which governs the assumption of a lease where default has occurred:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

It is undisputed that a substantial default has occurred here and that § 365(b)(1) applies. However, it is the amount of the

arrearages or the parameters of the default which is unknown. The Debtor apparently seeks to have the Court approve the assumption of the lease with no regard for the requirement of § 365(b)(1)(A). Obviously, the Debtor is not proposing to immediately cure the arrearages, especially since the amount of arrearages is disputed and it proposes to defer the determination of same. Therefore, it is difficult for the Debtor to argue that its proposal both promptly cures the default *and* provides adequate assurance that the default will be cured and that the C.A. will be compensated for future losses.

We believe, contrary to the Debtor's position, that it is necessary to determine the precise nature of the default *first,* in order to analyze whether its proposal for curing is prompt and whether adequate assurance has been given for the eventual, but necessarily "prompt," cure. This appears obvious to us because an analysis of whether the cure is prompt and whether adequate assurance has been given must be correlated to the parameters of default or amount of arrearages to be cured.[1]

Assuming *arguendo* that the arrearages are $50,000.00, which the Debtor suggests over the dispute of the C.A., the Debtor's Motion must be denied because the Debtor fails to make any provision for *adequate assurance* of a prompt cure, unless we optimistically extrapolate from the testimony of the Debtor's principal, Roger Harmon, that an increase in cash of $1,200.00 from the date of filing as compared to the end of the monthly reporting period of January, 1987, and an increase in accounts receivables of $10,800.00 for the month of January, 1987, concerning which he testified, suffice as adequate assurance for a prompt cure. We do not so find. As was succinctly stated in *In re Berkshire Chemical Haulers, Inc.,* 20 B.R. 454, 458

1. Therefore, were there a sufficient record made, we would be compelled to make a determination of arrearages. However, we find ourselves in a quandary because no evidence was produced from which the Court can fix the arrearages. Because we recognize that the lease

is necessary for the reorganization and operation of the Debtor's business, as well as for other reasons hereinafter expressed, we will fashion an Order designed to bring this matter to a head.

(Bankr.D.Mass.1982), and is *a propos* in the case under consideration:

> This Court can envision many cases where the promise to cure a default out of future profits might be sufficiently assured as to warrant approval of such a proposal. But, in the case before the Court there is no past history of profitability, there is no competent evidence of future profitability, and the debtor's projections seem nothing more than pipedreams.

In fact, the Debtor herein does not offer sufficient evidence to warrant a finding that its economic situation is improving. We have no evidence of either decreased costs in the operation of its business or increased sales. As in *In re R.H. Neil, Inc.*, 58 B.R. 969, 971 (Bankr.S.D.N.Y. 1986), the Debtor herein has not shown that it has a "reasonably demonstrable capability" to promptly cure the arrearages, which the Debtor has conceded to be at least $50,000.00.[2]

■ Since § 365(b)(1)(A) requires a prompt cure, the question arises as to what will constitute promptness as a matter of law. We agree with the statement that "the period of time that is considered 'promptly' may vary in accordance with the circumstances on a case by case basis." *In re Lawrence*, 11 B.R. 44, 45 (Bankr.N.D. Ga.1981) (10 months to cure $554.10 is held prompt but court speculates that a period in excess of one year is unlikely to be considered prompt). However, we do not agree with the dicta expressed in *Lawrence*, as we believe that a period of time in excess of a year could be prompt depending on the circumstances. *See In re Coors of North Mississippi, Inc.*, 27 B.R. 918 (Bankr.N.D.Miss.1983) (curing of default of between $110,000.00 and $115,000.00 within a 3–year period is a prompt cure in the circumstances presented there, particularly in light of the prospective longevity of successful business operations).

*In re R/P International Technologies*, 57 B.R. 869 (Bankr.S.D.Ohio 1985) (hereinafter referred to as "*R/P*"), is squarely on point with the case *sub judice*, as it involved a Chapter 11 debtor whose business was housed in a building under a lease who had fallen behind in rental payments. Wishing to continue to occupy those premises, the *R/P* debtor filed a motion to assume its lease, proposing to cure a stipulated arrearage of $156,000.00 over a 5–year period with interest at ten (10%) percent per annum. The *R/P* court squarely defined the issue as being whether this proposal met the "promptness" requirement of § 365(b)(1)(A). Noting that the proposed payment period was virtually co-extensive with the claimed life of the lease, and following the holding of *Berkshire, supra*, at 458, the *R/P* court was not satisfied as to the promptness of the cure. *Id.* at 873. The *R/P* court was also not satisfied that adequate assurance was given for the ultimate curing of the default because, while the debtor was current in its rent, it had not made the agreed-upon monthly payment on arrearages. *Id.*

In the instant case, assuming *arguendo* the existence of at least $50,000.00 arrears to be cured, the proposed repayment at the minimal rate of $250.00 per week for thirty-nine weeks per year would result in slightly more than five years, a period of time very close to being co-extensive with the remaining six-year life of the lease, not including the two five-year options to renew the lease. Although the Debtor's proposal provides that it will pay an additional four (4%) percent on its gross sales towards arrearages, there was no testimony as to the probability of its sales exceeding $75,000.00. The only evidence as to sales was the December, 1986, Operating Report showing cash sales of $49,285.34 plus collection of accounts receivables of $20,863.60 for a total of $70,225.54; and the

---

**2.** We must observe that the Debtor's concession that the arrearages are as low as approximately $50,000.00 is misleading for two reasons. First, the Debtor arrives at that figure by starting at an undocumented $64,000.00 figure as of June, 1986, and crediting itself for monies purportedly owed by the C.A. to the Debtor, but without specifying same. Secondly, the Debtor candidly testified that this figure, calculated in June, 1986, had not been adjusted for accruing arrearages since that date.

January, 1987, Operating Report showing $36,983.17 in cash sales and $14,597.44 in collected receivables for a total of $51,580.61. The evidence before us does not indicate a high likelihood that the Debtor would ever be responsible for payment of an additional four (4%) percent of gross sales towards arrearages. We note, without deciding, that such a repayment schedule without more, *e.g.*, competent evidence of future profitability, would not appear to be a "prompt" cure.

Section 365(b)(1)(B) also requires that the Debtor compensate or provide adequate protection of prompt compensation for the actual pecuniary loss suffered by a party as a result of the default. This requirement was not addressed or raised by either party. Consequently, we shall only note its existence in passing.

In addition to curing and compensating or providing adequate assurance of promptly doing so, the Debtor must also provide adequate assurance of future performance pursuant to § 365(b)(1)(C). Although what will satisfy § 365(b)(1)(C) will vary from case to case, some possibilities can include sufficient financial backing, escrow deposits or other similar forms of security or guaranty, or even promises. *In re Luce Industries, Inc.*, 8 B.R. 100, 107 (Bankr.S. D.N.Y.1980), *rev'd on other grounds*, 14 B.R. 529 (S.D.N.Y.1981). We agree with the *Luce* court that the assurance required "will fall considerably short of an absolute guaranty of performance." *Id. Accord, In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr.S.D.N.Y.1986). However, as we stated earlier, the Debtor here has not provided any specific promises resembling adequate assurance of anything.

■ In addition to objecting to the proposed assumption on the basis that the Debtor has failed to provide adequate assurance for payment of all arrearages in full, the C.A. has also asserted that the Debtor is not making all payments currently due under the lease, i.e., that the Debtor has defaulted in its post-petition rental obligations. This assertion is apparently not contested by the Debtor. In any event, § 365(b)(1) does apply "to both pre-petition

and post-petition defaults." *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 793 (Bankr.N.D.Ill.1985) (citing *Berkshire, supra*, 20 B.R. at 457; and *Luce, supra*, 8 B.R. at 104). Therefore, the foregoing analysis of § 365(b)(1) is not changed by the fact of post-petition arrears.

■ With respect to the C.A.'s contention that the Debtor's proposal would impermissibly modify the terms of the lease respecting the sale of alcoholic beverages, our examination of the lease reveals that it contains no restrictions on the sale of alcohol. Hence, the C.A.'s objection to the assumption of the lease on this basis could not be sustained, and the Debtor may sell alcoholic beverages in keeping with the permits issued by the Pennsylvania Liquor Control Board.

We do not find it necessary to address all of the proposed terms of the Order under which the Debtor seeks approval for the assumption of the lease with the C.A. We have only addressed those terms to which the C.A. has objected or which we believed must be addressed in the Debtor's efforts to cure its default pursuant to § 365(b)(1).

■ In addition to denying the Debtor's Motion as it stands, we are, in our accompanying Order, also striving to obtain a determination of what the arrearages actually are and what sort of a proposal the Debtor can tender to fashion a sufficiently "prompt" cure for the default, taking into account that the practical time for requiring the Debtor to make significant additional payments must wait until September, when student patronage will render the Debtor at full financial strength.

We have intentionally fashioned the attached Order with short timelines because we have assumed that the Debtor, acting in good faith pursuant to its earlier proposed Order, has already compiled the necessary information to determine the arrearages, and may have already provided it to the C.A. In any event, we strongly believe that the Debtor has derived a significant benefit from the delay in the determination compliance to § 365(b)(1), and we do not

wish to accord it any further such benefits unfairly.

However, we recognize that the C.A. also had its remedy pursuant to our Order of October 20, 1986, to relist its Motion for Relief from the Automatic Stay if the Debtor's terms for assumption were unacceptable. Despite the C.A.'s stated dissatisfaction with the proposed terms of assumption, we surmise that the C.A. is not greatly distressed at the Debtor's continued occupation of the premises since it has not moved for relief. In fact, the C.A. has stated its approval of the Debtor's assumption of the lease *if* done pursuant to different conditions. This may not be surprising when we consider that the lease rental, as compared to the fair market rental, as per the testimony at the October 10, 1986, hearing, is quite liberal to the C.A. Thus, the C.A. is faring quite well if it receives any payments on arrearages in addition to the lease rentals compared to what it would receive (possibly less than the current rent) if the Debtor were forced to liquidate or leave the premises. Also, the C.A. acknowledged, in the October 20, 1986, hearing, that the Debtor made significant improvements to the premises, and that the relationship between the parties, given the circumstances, has remained rather cordial.

On the other hand, we cannot overlook the fact that the Debtor has accumulated a default of admittedly at least $54,000.00. It would take fifty-four months to cure this arrearage at the rate of approximately $1,000.00 per month additional rent that we shall impose upon the Debtor beginning in September, 1987, even with the 13-week "moratorium" that the Debtor requests. Moreover, in so ordering, we are not suggesting that even $1,000.00 extra monthly payments without a moratorium would effect a prompt cure, but merely that payments of at least this amount would be prerequisite.

In sum, we cannot grant the Debtor's Motion. However, we will proceed to enter an Order which will keep the Debtor in place and compel it to begin making payments which are at least in the range that it would have to make to cure the default promptly. We also set forth a schedule to resolve this matter in the fashion which we believe that 11 U.S.C. § 365(b) dictates.

## ORDER

AND NOW, this 13th day of July, 1987, upon consideration of the testimony adduced and the briefs of the parties relative to the Debtor's Motion for Approval of its Assumption of an unexpired lease with the Christian Association (hereinafter referred to as the "C.A.") and the C.A.'s objection of the terms of the proposed assumption based upon the requirements of 11 U.S.C. § 365(b)(1), it is hereby ORDERED as follows:

1. The Debtor's Motion is DENIED without prejudice.

2. Through September 3, 1987, the Debtor shall continue to pay the C.A. the amount of $1,750.00 per week each Thursday pursuant to the terms of our Order dated October 20, 1986.

3. Beginning on September 10, 1987, the Debtor shall pay the C.A. the amount of $2,000.00 each Thursday pursuant to the terms of our Order of October 20, 1986.

4. The amount of arrearages under the parties' lease shall be established pursuant to the following schedule:

a. On or before July 31, 1987, the Debtor shall provide the C.A. with a schedule of total sales and sales of alcoholic beverages sold since the commencement of the lease and shall provide the C.A. with a specific statement showing all amounts which the Debtor believes to constitute arrearages under the lease, by category.

b. On or before August 12, 1987, the C.A. shall accept the amount of arrearages as stated by the Debtor or shall provide the Debtor with a specific statement showing all amounts which the C.A. believes to constitute arrearages under the lease, by category.

c. The parties shall have until August 24, 1987, to reconcile any difference between the amounts believed to constitute arrearages. In the absence of agreement, a hearing will be held on

TUESDAY, AUGUST 25, 1987 at 10:00 A.M. in Court Room No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106, at which time the statements provided for above, together with such additional evidence as the parties may introduce will be considered for the determination of the amount of the arrearages.

5. The Debtor shall have the right to file another Motion to Assume the Lease in issue, on or before September 18, 1987, or within seven days of the Court's determination of the arrearages after the hearing on August 25, 1987, whichever is later. If the Debtor fails to do so, the Lease shall be deemed rejected.

6. The C.A. may relist its Motion for Relief from Automatic Stay if the terms of paragraph two and three hereof are not complied with, upon the conditions set forth in paragraph one of the Order dated October 20, 1986, if it so chooses.