In re MAKO, INC., EIN 73–1775360, Debtor,

In re CIRCLE 7 FOOD STORES, INC., EIN 73–1036521, Debtor.

Bankruptcy Nos. 88–00475, 88–00477.

United States Bankruptcy Court, E.D. Oklahoma.

Sept. 13, 1988.

James Conrady and Mitchell Shamas for Debtor–in–Possession (DIP).

Janet Praver and Ann Vanderbeck for Derby Refining Co. (Derby).

Darrell Ford, for W.E. Allford, Inc. (Allford).

## ORDER

JAMES E. RYAN, Bankruptcy Judge.

On September 9, 1988, this Court conducted a hearing in the two above captioned cases regarding Derby Refining Company's Motion to Compel Debtors to Surrender Real Property and Equipment and Declare Master Agreement Terminated, filed in both cases on August 19, 1988. Also coming on for consideration was the Debtor–in–Possession's Response to the Motion, filed September 8, 1988.

Appearances were announced at the hearing by James Conrady and Mitchell Shamas on behalf of the Debtor–in–Possession (DIP), Janet Praver and Ann Vanderbeck for Derby Refining Company (Derby) and Darrell Ford representing W.E. Allford, Inc. (Allford).

Evidence was taken in open Court as to the Motions in the two cases as it is applicable and dispositive of both. For the purpose of this Order only, the Motions in both cases will be combined for resolution. However, this should in no way be construed to imply that this Court is consolidating these matters or encourages the filing of pleadings which do so.

This Court, having heard the testimony and examined the evidence presented, having considered the arguments of counsel and the applicable law, does hereby FIND:

## FINDINGS OF FACT

1. This is a "core" matter pursuant to 28 U.S.C. § 157(b).

· 2. The DIP entered into a written "Master Agreement and Lease" with Derby on January 12, 1988. Said Agreement encompassed the subleasing of eight non-residential real property sites (Store Nos. 605, 620, 643, 647, 671, 682, 683 and 684), equipment leasing and the purchases and sales of equipment and fuel inventories. All of the property involved in the Master Agreement was to be utilized in the DIP's convenience store operation.

3. Under the Master Agreement, monthly rental payments are to be made in full on the first day of each month to prevent a default.

4. On April 29, 1988, the DIP sought Chapter 11 relief under the United States Bankruptcy Code.

5. The DIP filed numerous Motions attempting to assume the Leases held by Derby. However, Derby objected to this assumption due to the DIP's continuing post-Petition defaults under the Master Agreement.

6. The DIP filed a pending Adversary Proceeding (Case No. 88–0039) on June 15, 1988 naming Derby a co-Defendant along with Allford. The Complaint alleged that Derby held some $230,087.30 in funds collected from credit card vouchers and receipts received from the DIP and sought an Order from this Court compelling an immediate turnover of these funds from Derby. As an affirmative defense to the DIP's allegations, Derby in its Answer filed July 15, 1988 asserted "Derby has rights of offset against both the Debtor and co-Defendant, W.E. Allford, Inc., with respect to the property that is the subject of the Complaint." Also, in an additional second affirmative defense, Derby set forth that "Derby has rights of equitable recoupment against both the Debtor and co-Defendant, W.E. Allford, Inc., with respect to the property that is the subject of the Complaint."

7. On July 14, 1988, the parties entered into an Agreed Order to overcome the opposition of Derby to the assumption of the

Master Agreement. This Agreed Order states that the DIP is in fact in default as to post-Petition rental payments due under the Master Agreement. Although no specific default amount is stated unequivocally in the text of the Agreed Order, a statement that the parties would rely on a list of the DIP's calculations of due and owing pre-Petition and post-Petition defaults is set forth. This listing as well as testimony at the hearing reveals that the amount in default owed by the DIP is $62,445.79 plus interest through July, 1988.

8. The Agreed Order outlines a payment schedule allowing the DIP to cure the defaulted lease payments making assumption of the lease possible. The payment of the indebtedness was to be made as follows:

(a) Twenty-five percent (25%) of the total defaulted amount to be paid on or before July 16, 1988 (i.e., $15,611.45);

(b) Twenty-five percent (25%) of the total defaulted amount to be paid on or before July 31, 1988 (i.e., $15,611.45);

(c) Twenty-five percent (25%) of the total defaulted amount to be paid on or before August 31, 1988 (i.e., $15,611.45); and

(d) The remaining 25% of the total default amount to be paid on or before September 15, 1988 (i.e., $15,611.45).

Said payments were to bear 12% per annum interest, according to the Agreed Order.

9. Derby's rights as to the claiming of further payments due to the inability of the parties to ascertain the exact defaulted amounts was not prejudiced by the acceptance of the DIP's calculation or signing of the Agreed Order, as set forth in its terms.

10. Upon the signing and entering of this Order, the DIP assumed the Derby Leases.

11. On August 5, 1988, this Court conducted a hearing to determine if a similar Order should be entered in the Circle 7 Foods case as was entered in the MAKO case. At this time, Derby announced that the DIP was in default under the terms of the Agreed Order.

12. This Court entered an Order allowing the DIP an additional ten (10) days or until August 15, 1988 by which to cure the defaulted rental payments.

The DIP tendered payment by corporate checks under the following schedule:

(a) Check No. 1754 dated August 12, 1988 in the amount of $30,784 for July rental payment;

(b) Check No. 1917 dated August 19, 1988 in the amount of $30,784 for May rental payment;

(c) Check No. 2134 dated August 30, 1988 in the amount of $30,784 for June rental payment; and

(d) Check No. 2154 dated August 30, 1988 in the amount of $10,000 for store/equipment rents.

Thus, the DIP failed to strictly adhere to the Agreed Order. All checks were returned to the DIP by Derby, unnegotiated, whereupon Derby awaited the resolution of the Motion presently under consideration by this Court.

## CONCLUSIONS OF LAW

A. Under the Bankruptcy Code at 11 U.S.C. § 365(b)(1), a DIP or trustee must promptly cure or assure the prompt cure of defaulted payments at the time of the assumption of an unexpired lease. This applicable section states:

"(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee—

(A) Cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) Compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) Provides adequate assurance of future performance under such contract."

In the present case, the parties do not dispute that the Master Agreement is in

the form of an unexpired lease and therefore available for assumption by the DIP. However, a dispute arises as to whether the DIP has or will promptly cure the admitted default and has given adequate assurance as to future performance.

■ B. The DIP is not required to tender payment for any defaults at the time of assumption—only "assure a prompt cure." "The period of time that is considered 'promptly' may vary in accordance with the circumstances on a case by case basis." *In re Gold Standard at Penn, Inc.*, 75 B.R. 669, 673 (Bankr.E.D.Pa.1987) citing *In re Lawrence*, 11 B.R. 44, 45 (Bankr.N.D.Ga.1981). Under the appropriate set of facts, "a period of time in excess of a year could be prompt ..." *In re Coors of North Mississippi, Inc.*, 27 B.R. 918 (Bankr.N.D.Miss.1983).

■ In the instant case, the DIP has made a considerable demonstration of a willingness and ability to cure the accrued defaults "promptly." The assertion of Derby is that the DIP has not adhered to the payment schedule as set forth in the Agreed Order. However, the DIP did in fact tender payments during the span of time envisioned in the Agreed Order in the amount of $102,352, far in excess of the $93,229.79 amount due and owing in defaulted payments and August rent. The objective of this Code Section is after all a "prompt cure" of defaulted payments to make the lessor whole, not to force adherence to a prescribed timetable set up by the parties. The accomplishment of this objective was attempted by the DIP and would have been carried through to fruition save for the returning of the checks by Derby.

Thus a prompt cure was assured at the time of assumption and accomplished through later actions of tendering payment.

C. Through the DIP's continued tendering of payments, by guaranteed Cashier's Check at the time of this hearing, it has provided the adequate assurances necessary to insure performance. Also, Derby has access to the DIP's financial records as filed in this Court which demonstrate that through a strong continued cash flow, future performance is assured.

D. Derby has made no claim for actual pecuniary loss, under § 365(b)(1)(B), thus this Code Section is mentioned only to acknowledge its existence in passing.

E. A factual nuance in this case which must be addressed is the assertion brought out in the aforementioned adversary and through testimony at the hearing on the present Motion, that Derby holds funds belonging to the DIP which may be offset against the claim for defaulted rents. Although Derby now claims that such an offset may not be accomplished without the express written consent of Allford as middleman between the DIP and Derby, we must examine the actions and representations of Derby before this time and whether it was reasonable for the DIP to rely on this fact. Derby at the very least left the distinct impression that it had the present ability to offset such funds unilaterally through its affirmative defense to the DIP's Adversary. This assertion is not conditional upon obtaining written consent from Allford, but rather is stated as an undisputed ability. Derby cannot claim privity of contract with the DIP when it is advantageous, such as in defense to an adversary, and then deny it when it fails to serve as a means to the creditor's ends in seeking to hold the DIP strictly to an agreement. Derby seeks to "eat with the hounds and run with the hares" in its assertions and this Court cannot condone this action on equitable grounds. Thus, the DIP's reliance that an offset would be taken is reasonable in this Court's view.

■ F. Finally, this Court cannot ignore the interests which would be harmed the greatest by the termination of the Master Agreement, loss of the Derby stores and collapse of the DIP's reorganization attempts. The only hope of recovery for the almost $8 million worth of unsecured claimants in this case is for the continued operation and success of the DIP's operation. This *must* be considered when balancing the fact that Derby will receive its due payments against the resulting suffer-

ing of the unsecured creditors if the lease is not allowed to remain intact.

 G. This Court, however, wishes there to be no doubt in the mind of Derby or the DIP as to the consequences of a default in any future rental payments under the Master Agreement. If such default should occur, the automatic stay pursuant to 11 U.S.C. § 362 will be lifted instanter without any further action by this Court, the DIP will surrender and abandon the property, and Derby may take immediate possession of the property described in the Master Agreement.

IT IS THEREFORE THE ORDER OF THIS COURT THAT:

(1) Derby's Motion to Compel Debtors to Surrender Real Property and Equipment and Declare Master Agreement Terminated in both the Mako case, No. 88–00475, and Circle 7 Food Stores case, No. 88–00477, is denied.

(2) DIP is ordered to make payment to Derby in the amount of $124,699.51 by September 19, 1988 or be in default. This amount consists of:

$63,131.51 defaulted amount under Agreed Order, including interest at 12% per annum

$30,784 August rental payment

$30,784 September rental payment.

(3) All future payments shall be made by Cashier's Check on or before the first day of each month. Failure to make such payments will result in the immediate termination of the automatic stay and repossession by Derby without application to this Court.