**In re EMBERS 86TH STREET, INC., Debtor.**

**Bankruptcy No. 95 B 41628 (JLG).**

United States Bankruptcy Court,
S.D. New York.

Aug. 7, 1995.

894

Martin H. Minsky, New York City, for debtor.

Kaufman Friedman Plotnicki & Grun, L.L.P., New York City, for Landlord.

### MEMORANDUM DECISION ON DEBTOR'S MOTION TO ASSUME LEASE

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Embers 86th Street, Inc. ("debtor") operates a cafeteria-style restaurant in rented space (defined below as the "Premises") located at 206 E. 86th Street, New York, New York (the 86th Street Building") which it occupies pursuant to an agreement dated July 10, 1992 (the "Sublease"). S & M Enterprises ("S & M"), as sublessor, has moved pursuant to § 365(a) of the Bankruptcy Code ("Code") for an order directing debtor to assume or reject the Sublease and to pay rent and other obligations allegedly due and owing thereunder. Alternatively, it seeks an order either modifying the automatic stay to permit it to exercise its state court remedies and regain possession of the Premises, or granting it adequate protection of its interests therein. Simultaneously, debtor has moved pursuant to § 365(a) for leave to assume the Sublease. For the reasons stated below, debtor's motion is denied. S & M's motion is denied as moot.[1]

### Facts

The facts, as established during the evidentiary hearing on these matters, are as follows.[2] Debtor is a New York corporation jointly owned by Florence Singer and her son Marshall Singer. On or about April 14, 1995, debtor filed a voluntary petition for relief under chapter 11 of the Code. Pursu-

---

1. Our subject matter jurisdiction of this contested matter is predicated on 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the Southern District of New York dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A), (G).

2. The parties stipulated to the admissibility of the exhibits used during the hearing. References to those exhibits will be to "Joint Ex. __."

ant to §§ 1107 and 1108 of the Code, it has remained in possession and control of its business and assets as a debtor in possession.

Stephen Perlbinder, Julius Perlbinder, and Barton Mark Perlbinder, doing business as Bar–Mar Associates (collectively, "Bar–Mar") own the 86th Street Building. On or about December 30, 1986, Bar–Mar and MSV Restaurant, Inc. ("MSV") entered into a fifteen (15) year lease (the "Over–Lease") of the store front and a portion of the basement of that building where MSV operated a restaurant. After MSV commenced its restaurant operations, it began utilizing a portion of the building's second floor for storage space. On July 10, 1992, Bar–Mar and MSV executed a Lease Extension and Modification Agreement. Under that agreement Bar–Mar modified the Over–Lease to include as part of the leased space, at no added charge to MSV, the area on the second floor which MSV was then using as storage space, and released any rent claims on account of MSV's use thereof. It also extended the term of the Over–Lease from December 29, 2011 to December 29, 2026. [The leased space covered by the Over–Lease, as modified, will be referred to as the "Premises".] Thereafter, on July 10, 1992, MSV and debtor executed the Sublease. Its term is from July 10, 1992 to July 31, 2002, with an option reserved to debtor to extend it through July 31, 2007.[3] Immediately thereafter, MSV assigned all of its right, title and interest as lessee under the Over–Lease to S & M.

The 86th Street Building abuts a building located at 1517–1519 Third Avenue (the "Third Avenue Building"). Both buildings have rear doors which open on to a common alley area located behind the buildings. The principal means of ingress and egress at the 86th Street Building is a doorway which opens on to 86th street. MSV's predecessor in the 86th Street Building was Geiger Vienna Pastry Shop & Restaurant ("Geiger"). In 1962, Geiger simultaneously operated businesses in the 86th Street and Third Avenue Buildings. Without obtaining the permission of the Third Avenue Building's landlord ("Third Avenue Landlord"), Geiger utilized

the alley area as a passageway between the two buildings. On or about July 3, 1962, the Third Avenue Landlord formalized that arrangement by granting Geiger a license (the "License"),[4] terminable at landlord's will on ten days notice, to utilize the alley "as a passageway to and from the store space of [Geiger] at [the 86th Street Building] and the store space occupied and used by [Geiger] in [the Third Avenue Building], and for no other purpose...." License ¶1. The License was recorded in the Office of the City Register, New York County, on or about July 16, 1962.

Just prior to the execution of the Sublease, Florence Singer and Marshall Singer toured the Premises with Mihaly Vestergom ("Vestergom"), an officer and director of MSV. Florence Singer testified that it was of paramount importance to the debtor that there be a legal second means of egress from the Premises to insure that debtor could use both floors of the Premises in the operation of its restaurant. Marshall and Florence Singer both testified that during their tour (which was Florence Singer's only visit to the Premises before debtor signed the Sublease; Marshall Singer visited the Premises twice, once with Vestergom six months prior to the execution of the Sublease and once with his mother and Vestergom) they asked Vestergom whether there was a legal second egress from the building. It is undisputed that he advised them that there was a legal means of egress through the alley area with access to the Third Avenue Building. Florence Singer stated that she observed the alley area and the door to the Third Avenue Building which was unlocked and in use. Neither Florence nor Marshall Singer requested Vestergom to provide debtor with documentation evidencing MSV's right to use the egress, or an explanation of the terms regulating its use thereof.

Florence Singer, Marshall Singer, Vestergom and Barton Mark Perlbinder and their respective counsel, attended the closing on July 10, 1992. Before executing the Sublease on behalf of the debtor, Florence Singer

---

3. A copy of the Sublease was submitted during the evidentiary hearing as Joint Ex. 2.

4. A copy of the License was submitted during the evidentiary hearing as Joint Ex. 3.

again requested assurances that a legal second means of egress from the Premises existed. Vestergom confirmed what he had earlier stated to the Singers. Thereafter, MSV's counsel drafted, and Vestergom executed, an affidavit memorializing Vestergom's advice, which was made part of the Sublease. In pertinent part, the affidavit states:

> [MSV] has used, as a second means of egress from the [P]remises, a rear alley area with access through a corridor from the rear to the front of [the Third Avenue Building] openly and consistently since May 1973.

> The Fire Department of New York City has inspected the method of egress and not objected to such method.

> To the best of my knowledge, this method of egress has been used since the early 1920's.

Vestergom Affidavit ¶¶ 3–5.

MSV never operated a restaurant on the second floor of the Premises. Accordingly, when the Sublease was signed, there was neither a public assembly permit nor an appropriate certificate of occupancy for the second floor, although both existed for the first floor. Debtor spent approximately $1 million renovating the Premises. Upon completion of those renovations, debtor sought to obtain a public assembly permit and appropriate certificate of occupancy for the second floor. Both requests were denied because the Premises lacked a legal second means of egress. Thereafter, the fire department issued a cease and desist order, which remains in effect, barring debtor from using the second floor in the operation of the restaurant. Only as those events were unfolding did debtor learn of the existence of the License and that it had been revoked by the Third Avenue Landlord subsequent to the execution of the Sublease.

Debtor fell into default under the Sublease pre-petition. On or about August 24, 1994, S & M served debtor with a Notice to Cure Default Under the Lease demanding debtor to cure defaults of $50,302.38 in rent and additional rent, and $3,333.33 in additional security due under the Sublease. Although the parties negotiated a payout schedule for the arrearages, debtor defaulted thereunder and on December 20, 1994, S & M served a "three-day rent demand" seeking payment of $101,912.36 allegedly due under the Sublease. When debtor failed to comply with the demand, S & M commenced a non-payment summary proceeding in the Civil Court of the State of New York, New York County. On or about January 17, 1995, debtor answered the petition. Thereafter, debtor allegedly proposed to make a payment to S & M of one month's rent, without prejudice, in exchange for a one month adjournment of the trial in the summary proceeding pending settlement discussions. Debtor paid the March 1995 rent, but the settlement discussions proved fruitless. The summary proceeding was set for trial on April 18, 1995. The trial was stayed by the filing of debtor's chapter 11 petition. Debtor is current post-petition under the Sublease.

## Discussion

■ Section 365(b) of the Code furthers chapter 11's goal of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate through the assumption and assignment of its executory leases against the landlord's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred. *See In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr.S.D.N.Y.1986). Pursuant to § 365(b)(1)(A), as a condition to the assumption of an executory lease, a debtor must either cure existing defaults thereunder or provide "adequate assurance" that it can "promptly cure" those defaults. *See* 11 U.S.C. § 365(b)(1)(A). For these purposes, " '[c]uring requires payment of all rental arrearages and other money obligations at the time the lease is assumed.' " *In re DWE Screw Products, Inc.*, 157 B.R. 326, 331 (Bankr.N.D.Ohio 1993) (citing 2 William L. Norton, Jr., Norton Bankruptcy Law and Practice § 23.11.55 (1992)). Debtor does not intend to cure its pre-petition default under the Sublease simultaneously with its assumption thereof. Rather, it proposes to remedy that default by making twelve (12) monthly payments of $5,000 and monthly payments of $8,000 thereafter, until the default is cured.

It has not specified when those payments will commence.

■ Debtor and S & M agree that pursuant to the terms of the Sublease, debtor's pre-petition default thereunder totals $193,782.43. *See* Joint Ex. 1. Debtor denies that it is required to pay 100% of those arrearages as a condition to assuming the Sublease. Debtor contends that it was fraudulently induced to execute the Sublease by Vestergom's allegedly misleading statements regarding the existence of a legal second means of egress at the Premises and/or his failure to disclose the License and the pertinent terms thereof. Debtor argues that Vestergom's alleged fraud, coupled with its mistake in failing to insist that the Sublease expressly require MSV to provide a legal second means of egress at the Premises, mandate that the Sublease be reformed to include such a provision. Debtor urges that by failing to provide the second egress, S & M, as sublessor, actually evicted it from the second floor of the Premises. Because that area allegedly represents 41.6% of the floor space in the Premises, debtor reasons that it is entitled to a rent abatement and that for purposes of § 365(b)(1)(A), its default under the Sublease should be recalculated as $92,848.42. S & M denies those assertions.

■ Reformation is an equitable remedy which permits the court "to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties." *George Backer Management Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219, 385 N.E.2d 1062, 1066, 413 N.Y.S.2d 135, 139 (N.Y.1978) (citing *Ross v. Food Specialties*, 6 N.Y.2d 336, 341, 189 N.Y.S.2d 857, 860, 160 N.E.2d 618, 621 (N.Y.1959)). *See also Restatement (Second) Contracts* §§ 155, 166. It has been granted where the defect in the written agreement is the product of the unilateral mistake of one party to the agreement and the fraud of the other. *See, e.g., United States ex rel. Bergen Point Iron Works v. Maryland Casualty Co.*, 384 F.2d 303 (2d Cir.1967) (per curiam); *National American Corp. .v. Federal Republic of Nigeria*, 597 F.2d 314, 322–23 (2d Cir.1979); *see also Chevis Publishing Corp. v. Pizza Hut, Inc.*,

No. 92 Civ. 5189, 1993 WL 277517 (S.D.N.Y. July 16, 1993) (granting motion pursuant to Fed.R.Civ.P. Rule 15 authorizing defendants to amend answer to assert counterclaim for reformation). Because the doctrine of reformation permits a party to an integrated agreement to "end-run" the parol evidence rule, it has been limited both substantively and procedurally. *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 574, 489 N.E.2d 231, 234, 498 N.Y.S.2d 344, 347 (N.Y.1986). There is a "heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties". *Id.* (quoting *George Backer Management Corp. v. Acme Quilting Co.*, 46 N.Y.2d at 219, 385 N.E.2d at 1066, 413 N.Y.S.2d at 139). Thus, "the proponent of reformation must 'show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties' ". *Id.* (citation omitted).

■ The elements of a fraud claim are (i) a misrepresentation of an existing material fact; (ii) knowingly or recklessly made by one party to a transaction to another; (iii) with the intent to deceive; (iv) which misrepresentation is justifiably relied upon; (v) to the detriment of the party relying on it. *E.g., Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987); *Channel Master Corp. v. Aluminium Ltd. Sales*, 4 N.Y.2d 403, 406–07, 151 N.E.2d 833, 835, 176 N.Y.S.2d 259, 262 (N.Y.1958). The party alleging fraud must establish each element by clear and convincing evidence. *E.g., Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987); *Simcuski v. Saeli* 44 N.Y.2d 442, 452, 377 N.E.2d 713, 718, 406 N.Y.S.2d 259, 265 (N.Y.1978); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 10, 280 N.E.2d 867, 871, 330 N.Y.S.2d 33, 39 (N.Y.1972).

Debtor cites Vestergom's affidavit and the Singers' uncontested testimony that Vestergom told them that there was a legal means of egress from the Premises through the Third Avenue Building as support for its assertion that Vestergom knowingly and intentionally misrepresented the existence of a second egress from the Premises. However, at all relevant times the License was in effect and there was a legal second means of egress

from the Premises. Indeed, during the hearing, Florence Singer admitted that nothing stated in the Vestergom affidavit was false. Because Vestergom's statements about the egress were true debtor has failed to prove that it was fraudulently induced to enter the Sublease. *See, e.g., Tomoser v. Kamphausen,* 307 N.Y. 797, 121 N.E.2d 622 (N.Y.1954) (complaint seeking recision of contract on grounds of fraud dismissed where plaintiff failed to prove defendant misrepresented material facts).

In *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 157 N.E.2d 597, 184 N.Y.S.2d 599 (N.Y.1959), the court held that where a party to a contract specifically disclaims reliance on a representation, that party cannot later claim that it was fraudulently induced to enter into the contract by the very representation it has disclaimed. Debtor seeks to do precisely that herein. Article 20 of the Sublease provides:

> Neither Owner nor Owner's agents have made any representations or promises with respect to the physical condition of the building, the land upon which it is erected or the [Premises], the rents, leases, expenses or operation, or any other matter or thing affecting or relating to the [Premises] except as herein expressly set forth and no rights, easements or licenses are acquired by [debtor] by implication or otherwise except as expressly set forth in the lease. [Debtor] has inspected the building and [Premises] and is thoroughly acquainted with their condition, and agrees to take the same "as is" and acknowledges that the taking of possession of the [Premises] by [debtor] shall be conclusive evidence that the [Premises] and building of which the same form a part were in good and satisfactory condition at the time such possession was taken, except as to latent defects. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone fully and completely expresses the agreement between Owner and [debtor] and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

Sublease Article 20. The rider executed by the parties to supplement the Sublease states, in pertinent part:

> [Debtor] acknowledges that it has inspected the Premises and agrees to accept possession thereof in its "as-is" physical condition on the commencement date of the within term, it being understood and agreed that Owner shall not be obligated to perform any alterations or improvements to the Premises.

Sublease Article 52. Because debtor is alleging that it was fraudulently induced to execute the Sublease by Vestergom's alleged misrepresentation regarding the License and debtor expressly disclaimed any reliance on representations regarding "rights, easements or licenses", application of the rule enunciated in *Danann* provides an additional ground for rejecting debtor's fraud claim.

■ As support for its assertion that Vestergom was required to advise the Singers that MSV's right to utilize the egress was subject to the License and to advise them of the pertinent terms of the License, debtor relies on *Junius Construction Corp. v. Cohen,* 257 N.Y. 393, 178 N.E. 672 (N.Y.1931). In that case, Cohen's testator ("Buyer") entered into a written contract to purchase a parcel of unimproved real property from Junius Construction Corp. ("Junius"). Buyer intended to construct a factory on that property. In the negotiations preceding the parties' execution of the agreement, Junius advised Buyer that the city had plans to build two streets on the exterior boundaries of the property, which could affect the extent to which that property could be developed. Junius knowingly and intentionally failed to disclose that a third road, bisecting the property, was also planned. 257 N.Y. at 396, 178 N.E. 672. After signing the contract, but prior to closing, Buyer learned of the existence of the third road and refused to close on the grounds that the street bisecting the property rendered the property useless to him because it precluded the planned construction of the factory. *Id.* Buyer sued to

recover his downpayment and Junius counterclaimed for specific performance. During the trial which was held two years after the contract was signed, the court held for Junius. In doing so, it refused to receive testimony as to Buyer's purpose in contracting to purchase the property and as to the change in his financial condition. *Id.* at 397, 178 N.E. at 672–73. The Appellate Division reversed and granted a new trial on the grounds that evidence of changed circumstances had been erroneously excluded. *Id.* The Court of Appeals affirmed, finding found that "there was a misrepresentation by the seller as to the situation of the land and the contingencies affecting the right to use it in the future whereby the buyer was relieved of the duty to go forward with the bargain." *Id.* at 399, 178 N.E. at 674. The court reasoned that Junius was "not at liberty in good conscience to list among the incumbrances the two unopened streets ... and suppress the existence of a third unopened street, which, if opened, would destroy the value for the use intended by the buyer." *Id.* at 399, 178 N.E. at 674. Significantly, the court did not hold that Junius was required to disclose the information about the streets. *Id.* at 400, 178 N.E. at 674 ("[W]e do not say that [Junius] was under a duty to mention the projected streets at all".) Rather the court held that "having undertaken or professed to mention [the streets], he could not fairly stop half way, listing those that were unimportant and keeping silent as to the other." *Id.* There is no evidence that Vestergom was aware of the License. Marshall and Florence Singer admit that they never asked Vestergom to explain the nature of MSV's right to utilize the egress. Debtor has not established that Vestergom suppressed or otherwise concealed any evidence from the Singers regarding the License. In any event, debtor's complaint is that Vestergom did not advise the Singers' about the License, not that he failed to disclose the whole truth about it. Thus, even assuming *arguendo* that Vestergom was aware of the License, *Junius* does not support debtor's assertion that he was bound to disclose it. Debtor does not argue that Vestergom otherwise was required to do so. *Compare Brass v. American Film Technologies, Inc.,* 987

F.2d 142, 150 (2d Cir.1993) (listing situations in which party to business transaction is required to make disclosure).

A tenant seeking to reform a lease must show "that because of the fraud of the landlord plus the unilateral mistake of the tenant, an agreement intended to be a part of the written lease was omitted." *Barash v. Pennsylvania Terminal Real Estate Corp.,* 26 N.Y.2d 77, 86, 256 N.E.2d 707, 712, 308 N.Y.S.2d 649, 656 (N.Y.1970); *see also George Backer Management Corp. v. Acme Quilting Co.,* 46 N.Y.2d at 219, 385 N.E.2d at 1066, 413 N.Y.S.2d at 139 ("the petitioning party has to show in no uncertain terms, not only that mistake or fraud exists, but exactly what was agreed upon between the parties"). Debtor failed to adduce any evidence that either MSV or S & M agreed to provide debtor with a second means of egress from the Premises as a condition to debtor's agreement to execute the Sublease. Florence Singer testified only that because she had discussed debtor's need for a second egress with Vestergom and Barton Mark Perlbinder, she assumed they both knew that debtor required one to operate its restaurant. Perlbinder's unequivocal testimony that S & M did not agree to provide a second means of egress is consistent with the terms of the Sublease. *See* Sublease Articles 20, 52. Debtor does not challenge the enforceability of those provisions. Accordingly, even assuming, *arguendo*, that debtor could establish fraud on the part of MSV, debtor is not entitled to reform the Sublease. *See Barash v. Pennsylvania Terminal Real Estate Corp.,* 26 N.Y.2d at 86, 256 N.E.2d at 712, 308 N.Y.S.2d at 656 (tenant's cause of action to reform the lease was dismissed due to his failure to clearly allege that there was a unilateral mistake on his part, not merely that "the lease was incorrectly drawn"); *Newark Ins. Co. v. Blair,* No. 92 Civ. 1648, 1994 WL 4410, 1993 U.S.Dist. LEXIS 18458 (S.D.N.Y. December 30, 1993) (defendant's motion for leave to amend answer to assert a counterclaim for reformation of a marine insurance policy to include a provision allegedly omitted from the original policy as a result of mutual mistake or fraudulently induced unilateral mistake, denied for lack of evidence demonstrating that the parties intend-

ed that provision to be in the original policy); *see also George Backer Management Corp. v. Acme Quilting Co.,* 46 N.Y.2d at 219, 385 N.E.2d at 1066, 413 N.Y.S.2d at 139 (tenant's claim for reformation was rejected because he failed to show error in the making of the contract by a standard of clear and convincing evidence, and, in addition, he could not prove misrepresentation because the tenant could not reasonably rely upon the landlord's indefinite statements).

A partial actual eviction occurs when a landlord wrongfully ousts a tenant from a portion of the demised premises that tenant is entitled to utilize under its agreement. *Fifth Ave. Bldg. Co. v. Kernochan,* 221 N.Y. 370, 117 N.E. 579 (N.Y.1917); *524 West End Ave. v. Rawak,* 125 Misc. 862, 212 N.Y.S. 287 (N.Y.App.Term 1925). *See also* Joseph Rasch, *New York Landlord & Tenant* §§ 900 & 901 (2d ed. 1971). A landlord's wrongful interference with a tenant's appurtenant right of ingress and egress can give rise to a claim of partial actual eviction. *See, e.g., Seigel v. Neary,* 38 Misc. 297, 77 N.Y.S. 854 (N.Y.App.Term 1902) (partial actual eviction found where landlord obstructed one of commercial tenant's doorways, impeding tenant and customers from entering premises); *Lawrence v. Denham Co.,* 58 Misc. 543, 109 N.Y.S. 752 (N.Y.App.Term 1908) (partial actual eviction found when the landlord deprived the tenant of entrance into the building to his second floor premises for tenant's business affairs); *487 Elmwood, Inc. v. Hassett,* 107 A.D.2d 285, 486 N.Y.S.2d 113 (N.Y. 1985) (partial actual eviction found where the landlord of a shopping plaza leased two-thirds of the tenant's parking lot to a fast food chain). It follows from our rejection of debtor's reformation claim that S & M had no obligation to provide a second means of egress from the Premises and its failure to do so in no way interfered with debtor's use of the Premises. In any event, debtor was not actually evicted from the second floor of the Premises. Florence Singer admitted that notwithstanding the fire department's cease and desist order, and the lack of a certificate of occupancy, debtor regularly utilizes the second floor space to accommodate overflow crowds on weekend nights. As a matter of law, debtor cannot establish that it

has been partially actually evicted from the second floor of the Premises. *See generally 41st RKC Tribune Assoc. v. Small Computer Co.,* 130 Misc.2d 231, 495 N.Y.S.2d 640 (N.Y.Civ.Ct.1985) (no partial actual eviction where landlord merely interfered with lessee's access to demised premises). Accordingly, debtor is not entitled to an abatement of its pre-petition default under the Sublease and we fix the default at $193,782.43.

Under debtor's proposal, it will cure that default over a period of twenty-nine (29) months. Whether a cure is "prompt" for purposes of § 365(b)(1)(A) depends on the facts and circumstances of each case. *E.g., In re Mako, Inc.,* 102 B.R. 818, 821 (Bankr. E.D.Okla.1988) (quoting *In re Gold Standard at Penn, Inc.,* 75 B.R. 669, 673 (Bankr. E.D.Pa.1987)) (citing *In re Lawrence,* 11 B.R. 44, 45 (Bankr.N.D.Ga.1981)). In authorizing debtor to assume an executory beer distributorship, the court in *In re Coors of North Mississippi, Inc.,* 27 B.R. 918 (Bankr. N.D.Miss.1983), permitted debtor to cure a pre-petition default totalling between $110,000 and $115,000 over a thirty-six (36) month period. In doing so, the court found (1) that the cure period was not unreasonably long in light of the expected duration of the agreement, (2) the entity to whom the agreement was to be assigned was so financially sound that completion of the cure payment was assured and (3) the post-petition franchisor had improperly compelled debtor to make payments on account of its pre-petition claim. *Id.* at 922. *Compare In re R/P International Technologies, Inc.,* 57 B.R. 869, 872–73 (Bankr.S.D.Ohio 1985) (debtor's proposal to cure $156,000.00 in rent arrearage over sixty months was not "prompt" because it was virtually co-extensive with the remaining term of the lease); *In re Berkshire Chemical Haulers, Inc.,* 20 B.R. 454, 458 (Bankr. D.Mass.1982) (rejecting debtor's proposal to cure arrearage over an eighteen month period because lease had only eighteen months left to run). This case is distinguishable from *Coors* because, among other things, S & M has not engaged in inequitable conduct post-petition and because debtor has not provided adequate assurance that it can make the proposed cure payments. "Adequate as-

surance of a prompt cure requires that there be a firm commitment to make all payments and at least a reasonably demonstrable capability to do so." *In re R.H. Neil, Inc.*, 58 B.R. 969, 971 (Bankr.S.D.N.Y.1986); *accord Matter of World Skating Center, Inc.*, 100 B.R. 147, 148–49 (Bankr.D.Conn.1989) ("Adequate assurance requires a foundation that is nonspeculative and sufficiently substantive so as to assure the landlord that it will receive the amount of the default.") James W. Leonard, debtor's accountant, testified that on the basis of debtor's gross sales in 1993 and 1994, debtor's annual net profit for 1995 would be $200,000, leaving an average projected monthly profit of $7,500.00 [5]. He conceded, however, that debtor has never achieved gross sales at the Premises sufficient to meet his projection, and that its current monthly operating profit totals approximately $6,100.00. In the face of debtor's actual performance to date, Florence Singer testified that debtor would achieve the necessary level of profitability by reducing operating costs and increasing revenue. Debtor already has hired a new manager and bookkeeper at a total monthly savings of $1,600.00, Ms. Singer has reduced her salary, and debtor proposes to cut its staff and eliminate overtime payments. Although debtor is spending less on food, it is doing so, in part because it is offering smaller portions to its customers. On the revenue side, debtor proposes to increase its prices. Florence Singer explained that debtor entered the Sublease with the expectation that it could capitalize on the profitable bus tour and party trade by using the second floor. Given our determination that the Sublease will not be reformed to require S & M to install a legal second egress, and debtor's acknowledgment that it lacks the funds necessary to construct one, debtor cannot count on the use of the second floor to generate additional business. In substance, debtor proposes to meet its projections by reducing its staff (and thereby affording its customers fewer ser-

vices) while simultaneously offering smaller food portions at increased prices. That debtor's plan is speculative and overly optimistic is evidenced by debtor's performance to date. Debtor's reliance on *In re R.H. Neil, Inc.*, 58 B.R. 969, is misplaced. First, the cure amount was only $17,000.00 and debtor proposed to pay it in three months. Moreover, debtor established that it had improved its profit margin by reducing payroll and eliminating unproductive lines of merchandise, was controlling administrative expenses and paying cash on delivery for 95% of its inventory, and post-petition had experienced increased sales from which it could project an increase in post-petition profits of twenty-two percent. 58 B.R. at 971–72. In contrast, although debtor has achieved post-petition economies, it intends to improve profitability by offering reduced services at increased prices in leased space which will not allow it to substantially increase its sales. Under these circumstances, debtor's cure proposal does not satisfy § 365(b)(1)(A) both because the proposed cure is not prompt and because debtor cannot provide adequate assurances that it can make the cure payments. *Compare In re Coors of North Mississippi, Inc.*, 27 B.R. 918 (three year cure plan approved where debtor provided adequate assurance of its ability to make cure payments), *with Matter of World Skating Center, Inc.*, 100 B.R. 147 (three year cure plan rejected where debtor failed to substantiate claim that it could cure $40,000 arrearage under lease).

Leonard estimated that debtor's "going concern" value totals $750,000.00. He arrived at that figure by assuming an annual projected net profit of $200,000.00 for each of the next discounted by 25%. Debtor argues that in determining the merits of the motion we must consider the windfall S & M allegedly will receive if the debtor loses its Sublease. As noted, debtor's projected net profit is at best speculative. Further, while we are cognizant that the lease is integral to debtor's reorganization, we nonetheless must still bal-

---

**5.** Leonard testified that he derived this number as follows:

| | |
|---|---:|
| average historical sales | $2,000,000.00 |
| cost of goods sold | $800,000.00 |
| operating costs | $1,000,000.00 |
| officers' salaries | $80,000.00 |

| | |
|---|---:|
| total profit | $120,000.00 |
| assumed 25% discount factor | × .75 |
| total discounted profit | $90,000.00 |
| pro-rated over twelve months | ÷ 12 |
| total monthly profit | $7,500.00 |

ance debtor's interest in retaining the Sublease against the landlord's interest in receiving the benefit of his bargain without undue risk of future defaults. On the record before us, debtor has failed to provide adequate assurance of its ability to cure its default.

In assessing adequate assurance of future performance under § 365(b)(1)(C), "[t]he test is not one of guaranty, but simply whether it appears that the rent will be paid and other obligations met." *In re THW Enterprises, Inc.,* 89 B.R. 351, 357 (Bankr. S.D.N.Y.1988). Thus, courts look for evidence of profitability such as demonstrated reductions in operating costs, payroll, and inventory coupled with an increase in sales, *see In re R.H. Neil, Inc.,* 58 B.R. at 971; a plan which would earmark money exclusively for the landlord, *Buchakian v. Musikahn Corp.,* 69 B.R. 55, 56 (E.D.N.Y.1986); or the willingness and ability of debtor or debtor's assignee to fund the cure payments. *See In re Bygaph, Inc.,* 56 B.R. at 605. None of those factors are present here. Moreover, debtor's failure to sustain its burden of proof with respect to § 365(b)(1)(A) disproves its assertion that it can adequately assure performance of the Sublease. *See Matter of World Skating Center, Inc.,* 100 B.R. at 149.

### Conclusion

Based on the foregoing, debtor's motion to assume the Sublease is denied. S & M's request for relief from the automatic stay is denied as moot.

SETTLE ORDER.